UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-11022-GAO

AMY DRACHMAN,
Plaintiff,

v.

BOSTON SCIENTIFIC CORP., ANN FITZPATRICK,
ELIZABETH S. HENDLER, and JEAN F. LANCE,
Defendants.

ORDER ADOPTING REPORT AND RECOMMENDATION
April 28, 2017

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has filed a report and recommendation ("R & R") with respect to the defendants' Motion to Dismiss Counts II (as to Defendants Hendler and Fitzpatrick), III, IV, and V of the Plaintiff's Amended Complaint (dkt. no. 21). No objections to the R & R were timely filed.

After carefully reviewing the pleadings, the parties' motion papers, and the R & R, I ADOPT the recommendation of the magistrate judge. The defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Count II is dismissed as to Fitzpatrick and Count IV and V are dismissed in their entirety.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


AMY DRACHMAN,
     Plaintiff,


     v.                                     CIVIL ACTION NO. 16-11022-GAO


BOSTON SCIENTIFIC CORPORATION,
ANN FITZPATRICK,
ELIZABETH S. HENDLER, AND
JEAN F. LANCE,
     Defendants.


REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS (#21).


KELLEY, U.S.M.J.

## I. Introduction.

Plaintiff Amy Drachman, proceeding *pro se*,[1] filed this action against her former

employer Boston Scientific Corporation (BSC) and its executive employees Ann Fitzpatrick,

Elizabeth S. Hendler, and Jean F. Lance (the individual defendants) alleging violations of the

Family Medical Leave Act (FMLA), Count I, the Massachusetts Wage Act (MWA), Count II,

the Americans with Disabilities Act (ADA), Count III, as well as common law claims for breach

of contract and the covenant of good faith and fair dealing, Counts IV and V respectively. (#20.)

Defendants filed a motion to dismiss Count II (against defendants Hendler and Fitzpatrick) and

---

[1] Plaintiff is an attorney. (#20 ¶ 5.)

Counts III, IV, and V in their entirety (#21); plaintiff responded in opposition (#24). At this juncture the motion to dismiss stands ready for decision.

## II. The Facts.

The facts as set forth in the amended complaint (#20) are as follows. On September 1, 2010, plaintiff started working at BSC as director of employment policy and compliance in the global compliance department. (#20 ¶ 11.) She was terminated on March 14, 2014. *Id.*

Plaintiff has a serious medical condition, a dissected descending aorta with a thoracic aneurysm, which is considered a physical impairment that substantially limits a major life activity under the ADA. *Id.* ¶ 12. Plaintiff's condition entitles her to leave under the FMLA. *Id.* On March 20, 2013, plaintiff took leave under the FMLA which BSC approved and certified. *Id.* ¶ 13. In the twelve months leading up to her leave of absence, plaintiff worked more than 1,250 hours and reported to defendant Lance, BSC's chief compliance officer. *Id.* ¶¶ 14, 15. Plaintiff's job, which required that she have a juris doctorate degree, included interpreting and enforcing BSC's employment policies for all employees in the United States, ensuring compliance with federal and state employment laws and regulations, and serving as the equal employment opportunity officer responsible for BSC's affirmative action program. *Id.* ¶ 16. Plaintiff's duties also included overseeing BSC's global privacy program, managing the director of privacy, a privacy specialist, and an administrative assistant in the global compliance department, as well as serving as one of the directors on Lance's leadership team of the global compliance department. *Id.* ¶ 17.

On July 25, 2013, while on FMLA leave, plaintiff received a telephone call from Lance informing plaintiff that her position was being transferred, effective upon her return, to the employment law group within the legal department. *Id.* ¶ 18. As part of this transfer, plaintiff

would be reporting to defendant Hendler, the vice president of employment law and manager of BSC's employment law function. *Id.* Lance explained that in plaintiff's new position she would no longer have any employees reporting to her. *Id.* ¶ 19. In addition, plaintiff would no longer have managerial responsibility for the global privacy program, nor would she have a leadership role in the legal department. *Id.*

In August 2013, after receiving approval from her cardiologist to return to work part time, plaintiff returned to BSC in her demoted[2] position in the legal department reporting to Hendler. *Id.* ¶ 21. Plaintiff worked in her new role subject to medically-imposed restrictions, which limited her work to four to five hours per day. *Id.* ¶ 23. Prior to her leave of absence and after her return, plaintiff received multiple calls from BSC's human resources professionals (plaintiff's internal clients) who were concerned that Lance intended to transfer or terminate improperly other employees in the global compliance department who were then on FMLA leave. *Id.* ¶ 24.

Approximately five months after returning from FMLA leave, plaintiff received a letter from BSC (#20-1 at 1) stating that her health insurance, which was an employee benefit that she and her sons received, was to be cancelled for the reason of "Other" retroactive to September 16, 2013, more than four months prior. *Id.* ¶ 27; (#20-1 at 1.) Plaintiff alleges that the cancellation of her insurance was improper as she had paid the necessary premiums and worked the minimum number of hours. In addition, the timing of the notice failed to comport with the 45-day pre-cancellation notice requirement set forth in the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA). (#20 ¶¶ 28-30.) Plaintiff notified BSC's human resources benefits manager about the impropriety of the cancellation of her family's health insurance. *Id.* ¶ 32.

---

[2] Plaintiff's new role did not have equivalent duties, status, or authority as compared to her pre-leave position in global compliance. (#20 ¶ 22.)

After several conversations initiated by plaintiff, BSC's human resources benefits manager concerned that the notice and retroactive cancellation of plaintiff's health insurance was improper and invalid. *Id.* ¶ 34.

Two weeks after receiving the notice of cancellation of her health insurance and five months into her post-leave employment, on January 29, 2014, plaintiff received a letter from Hendler (#20-1 at 2), her manager, in which Hendler informed plaintiff that she was to be terminated because BSC could no longer accommodate her part-time work restriction. *Id.* ¶ 35; (#20-1 at 2.) The letter stated that plaintiff could retain her position until a replacement was hired. (#20 ¶ 37; #20-1 at 2.)

On March 7, 2014, plaintiff received her 2013 annual performance bonus from BSC. (#20 ¶ 39.) The bonus was evidence that she had satisfied her performance bonus requirements for 2013. *Id.* Plaintiff received full bonus credit for the period during which she was entirely absent from work as a result of her FMLA leave. *Id.* ¶ 40. With respect to her post-leave part-time work, BSC prorated plaintiff's bonus to reflect the decrease in hours worked. *Id.* ¶ 41. This resulted in an approximately $6,000.00 decrease in plaintiff's bonus for 2013. *Id.* Plaintiff asserts that she was entitled to a bonus reflecting a full-time schedule and that BSC's actions violated its annual bonus plan (#20-1 at 3-15). *Id.* ¶ 42. Shortly after receiving her allegedly undersized bonus, plaintiff questioned Hendler, who was the leader of the employment law group, about the matter. *Id.* ¶ 43. Hendler told plaintiff that she would look into the matter, but BSC never paid plaintiff the additional $6,000.00. *Id.* ¶ 44.

Approximately one week before she was terminated, around March 7, 2014, plaintiff met with Hendler for an exit interview. Hendler confirmed that plaintiff had accrued 22 days of vacation time that would be paid out upon termination, per BSC policy. *Id.* ¶ 45. BSC policy, in

compliance with the MWA, mandates that involuntarily terminated Massachusetts employees be paid their final paycheck and any vacation pay on their last day of work. *Id.* ¶ 46. Each of the individual defendants was allegedly responsible for compliance with BSC policies and the MWA with respect to final paychecks and vacation pay. *Id.* ¶ 47.

On her last day of work, March 14, 2014, plaintiff contacted Fitzpatrick, human resources director and business partner to the legal department, and asked about her final paycheck and vacation pay. *Id.* ¶ 48. Fitzpatrick assured plaintiff that she would receive her final paycheck and accrued vacation pay, but said that she would not be receiving them on her last day. *Id.* ¶ 49. Instead, Fitzpatrick explained, plaintiff would receive these payments on BSC's next regular payday (seven days later), despite the involuntary nature of plaintiff's termination. *Id.* When questioned by plaintiff as to why the payments would not be made on the date of termination, Fitzpatrick stated, via email (#20-1 at 16-17), that there was work to be done to ensure that plaintiff's life insurance and COBRA were calculated properly. *Id.* ¶ 50; (#20-1 at 16-17.) Plaintiff asserts that the individual defendants had ample notice of her upcoming termination based on the fact that plaintiff received notice of her termination a full two months earlier, and thus did not need this time to calculate her benefits. (#20 ¶ 51.)

Five days after plaintiff's termination, BSC issued her final paycheck and accrued vacation payout. *Id.* ¶ 54. She asserts that the amount she received was a fraction of what she was owed both for wages and vacation pay.[3] *Id.* ¶ 55. Around March 19, 2014, plaintiff contacted BSC's payroll department regarding the erroneous payment, and payroll advised her not to cash the checks that had been issued as new checks would be issued in an effort to correct

---

[3] BSC paid plaintiff $1,306.49 in wages for her last week, instead of the $2,177.49 she was owed, and $6,532.48 for her accrued vacation, which was allegedly less than half of what she was owed. (#20 ¶ 55.)

the errors. *Id.* ¶ 56. On March 22, 2014, plaintiff received a new final paycheck and vacation payout. *Id.* ¶ 57. The final paycheck reflected the correct amount, but the vacation payout, in the gross amount of $10,887.47, was still deficient because it did not reflect all of the vacation time Hendler and Fitzpatrick had assured plaintiff would be included in her final payout. *Id.* Plaintiff again contacted payroll to inquire about the missing vacation pay. *Id.* ¶ 58. Payroll informed plaintiff that her balance of 22 vacation days had been significantly reduced after she departed.[4] *Id.* ¶ 59. The vacation days in question had been accrued prior to plaintiff's FMLA leave, when she was working a full-time schedule. *Id.* ¶ 61. Defendants refuse to compensate her for the lost days or the remainder of her 2013 bonus. *Id.* ¶¶ 62, 63.

Plaintiff alleges that in addition to the issues with her final paycheck and deficient vacation payout, she was also denied severance benefits that BSC customarily pays to involuntarily terminated employees, absent gross misconduct. *Id.* ¶ 64. BSC maintains several official Employee Retirement Income Security Act (ERISA) severance plans as well as an unofficial severance plan through which BSC offers involuntarily terminated former employees essentially the same benefits they would have received under one of the ERISA plans, had the ERISA guidelines been applicable. *Id.* ¶¶ 65-68. BSC allegedly provides these unofficial severance benefits to former employees in an effort to ease their transition out of the company. *Id.* ¶¶ 68-70. Plaintiff takes the position that she was denied any form of severance benefits, even though they were provided to other similarly situated former employees who had not utilized FMLA. *Id.* ¶ 71.

For the duration of plaintiff's employment, there were no other lawyers in the legal department of BSC who worked part time as regular employees. *Id.* ¶ 73. While plaintiff was on

---

[4] Plaintiff does not identify any individual actors responsible for this change, but simply states "Defendants had significantly reduced the number of accrued vacation days." (#20 ¶ 59.)

FMLA leave, BSC retained an employment lawyer, Therese Marso, for the purpose of assisting BSC with reductions in force. *Id.* ¶ 74. Upon returning from FMLA leave, plaintiff was told by Hendler that Marso had a background that was similar to plaintiff's, with experience in human resources and employment law. *Id.* ¶ 75. Marso was initially hired as a part-time defined term employee[5] and was expected to work around twenty hours per week. *Id.* ¶ 76. Prior to her termination, Hendler told plaintiff that BSC's intention was to downgrade plaintiff's position to one that would no longer require a legal degree. *Id.* ¶ 78. Hendler identified an internal candidate, who had been working in a human resources role, who would assume some of plaintiff's duties in a new role, with a new title, and no need for a law degree. *Id.* ¶ 79. After leaving BSC, plaintiff learned that defendants had converted Marso's temporary position into that of a regular part-time employee in which she was performing some of plaintiff's former duties that required a law degree. *Id.* ¶ 80. Thereafter, on May 7, 2015, Marso, at the direction of Hendler, reached out to plaintiff regarding some legal research that plaintiff had compiled while employed at BSC. *Id.* ¶ 81. Plaintiff came to the conclusion that defendants could have accommodated a part-time legal position in the legal department, and that plaintiff's work restriction was merely an excuse to justify her termination. *Id.* ¶ 82.

### III. Standard of Review.

A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a claim. In deciding such a motion, a court must "'accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor.'" *Haley v.*

---

[5] Defined term employees, per BSC's worker classification policy, are not supposed to be employed by BSC for longer than 24 months in that role. (#20 ¶ 77.) Such employees are usually hired to work in a specific department on a long-term project until the work is completed (after which their employment will end). *Id.*; (#20-1 at 18.)

*City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011)). When considering a motion to dismiss, a court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley*, 657 F.3d at 46 (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)).

In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "obligation to provide the grounds of [the plaintiff's] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotation marks and alteration omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to cross the "line from conceivable to plausible." *Id.* at 555, 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). However, the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). Simply put, the court should assume that well pleaded facts are genuine and then determine whether such facts state a plausible claim for relief. *Id.* at 679.

## IV. <u>Discussion</u>.

As stated above, plaintiff asserts claims stemming from her allegedly improper termination: Count I alleges that defendants took adverse employment actions against her in response to her taking FMLA leave, (#20 ¶¶ 87-98); Count II alleges that defendants violated the

MWA by failing to pay plaintiff wages, accrued vacation pay, and a portion of her 2013 bonus, *id.* ¶¶ 99-116; Count III alleges that defendant BSC violated the ADA when it discriminated against plaintiff by failing to offer her any form of unofficial severance benefits, despite the fact that it had done so for other similarly situated involuntarily terminated employees who were not disabled, *id.* ¶¶ 117-126; Count IV alleges that defendant BSC breached the terms of the Bonus Plan when it improperly reduced plaintiff's 2013 bonus for the period during which plaintiff worked in a part-time capacity, *id.* ¶¶ 127-134; and in addition, under Count IV, plaintiff alleges defendant BSC's failure to provide any form of unofficial severance benefits constituted a breach of the unofficial severance plan. *id.*; and Count V alleges that defendant BSC breached the covenant of good faith and fair dealing when it failed to pay plaintiff the entirety of her 2013 bonus, the remainder of her accrued vacation payout, and any amount of unofficial severance benefits, i*d.* ¶¶ 135-144. In response, defendants argue that several of plaintiff's claims are barred by the statute of limitations, cannot stand as a matter of law, or cannot be asserted against certain individual defendants. (##21, 22.) Notably, plaintiff's opposition only addresses defendants' arguments with respect to Count II. (*See* #25.)

### 1. Violation of the MWA – Count II.

The MWA provides a cause of action for employees whose wages have been wrongfully withheld. *See* Mass. Gen. Laws ch. 149, § 148. To establish a claim under the statute, a plaintiff must show that (1) she was an employee under the statute; (2) her form of compensation constitutes a wage under the statute; (3) the defendants violated the Act by not paying her wages in a timely manner; and (4) with respect to individual defendants, that they are corporate officers as defined by the statute. *Stanton v. Lighthouse Fin. Servs., Inc.*, 621 F. Supp. 2d 5, 10 (D. Mass. 2009). Defendants argue that plaintiff has not pled sufficient facts to show that Hendler and

Fitzpatrick are corporate officers under the statute. (#22 at 16.) With regard to individual actor liability, the MWA states the following:

> The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section. Every public officer whose duty it is to pay money, approve, audit or verify pay rolls, or perform any other official act relative to payment of any public employees, shall be deemed to be an employer of such employees, and shall be responsible under this section for any failure to perform his official duty relative to the payment of their wages or salaries, unless he is prevented from performing the same through no fault on his part.

Mass. Gen. Laws ch. 149, § 148.

While the language of the MWA above provides a rough sketch of the class of people who may be sued, more information is necessary to determine if the individual defendants here are subject to liability under the MWA. The Supreme Judicial Court of Massachusetts (SJC), when examining the addition to the MWA in which the scope of liability was extended to include individual actors, found "a clear legislative intent to ensure that individuals with the authority to shape the employment and financial policies of an entity be liable for the obligations of that entity to its employees." *Cook v. Patient Edu, LLC*, 465 Mass. 548, 554 (2013). The SJC concluded that liability under the MWA extends to all persons "having employees in his service, . . . if he controls, directs, and participates to a substantial degree in formulating and determining policy of the business entity[.]" *Id.* at 556 (internal citation and quotation marks omitted). This expansive view of potential liability is circumscribed by an earlier SJC decision in which the court found that "[m]erely holding a managerial position over some branch, division, or office of a corporation does not, by itself, mean that that manager has the 'management' of the 'corporation' as a whole." *Wiedmann v. The Bradford Grp., Inc.*, 444 Mass. 698, 712 (2005)

(concluding that the defendant in issue did not direct and participate to a substantial degree in the formulation and determination of company policy).

While the SJC's interpretation of the language of § 148 creates a general framework for analyzing an actor's status, it is clear that the analysis is fact-intensive and context-specific. *See, e.g., Yayo v. Museum of Fine Arts*, No. CIV.A. 13-11318-RGS, 2014 WL 2895447, at *8 (D. Mass. June 26, 2014) (declining to extend individual liability to the voluntary President of the Board of Trustees of defendant); *Specialty Mktg. Grp., Inc. v. Katz*, No. CIV.A. 13-12636-LTS, 2014 WL 2453105, at *6 (D. Mass. May 30, 2014) (defendants who controlled the business and were responsible for payment decisions could be held individually liable under MWA); *Porcal v. Ciuffo*, No. 10-CV-40016-TSH, 2013 WL 3989668 (D. Mass. Aug. 1, 2013) (President and Treasurer who actively managed the businesses in issue could be held individually liable under the MWA); *Cook*, 465 Mass. 548 (extending individual liability under the MWA to a manager of an LLC); *Donaldson v. Shapemix Music, LLC*, No. CIV.A. 2012-2620-E, 2013 WL 7121289, at *2 (Mass. Super. Dec. 11, 2013) (finding that executive officers who were engaged in all facets of employee and payroll matters and had the ability to control all decisions related to employment matters could be held individually liable under the MWA).

Here, defendants argue that Hendler and Fitzpatrick are not corporate officers because plaintiff has not sufficiently pled that they held the requisite authority for managing BSC. (#22 at 16.) As BSC has more than 20,000 employees and a complex corporate structure, the task of determining which actors are caught in the net of the MWA is daunting. Taking the facts alleged in the amended complaint in the light most favorable to plaintiff, she has met her burden at this stage with respect to Hendler, but has failed to show that Fitzpatrick's position is one of control and substantial participation in company policy.

As alleged in the amended complaint, Hendler was the vice president of the employment law group and a member of the global compliance committee, which determined consequences when employees violated BSC's code of conduct. (#20 ¶¶ 9, 109.) Hendler also participated in the senior leadership team of the human resources function and contributed to global decision making concerning BSC employees, including being involved in the development of BSC's employment policies, compensation schemes, and performance evaluation system. *Id.* ¶ 110. Additionally, Hendler, or her delegate, controlled the employee selection process and implementation of company-wide reductions in force. *Id.* ¶ 111. Examining the entirety of Hendler's alleged duties and her intimate involvement in company policy-making groups, it is evident that she falls within the category of individuals the legislature intended to capture when they expanded the MWA to allow for individual liability.

With respect to Fitzpatrick, the human resources director of BSC, her duties in the global compliance and legal departments included managing and controlling the financial policies of her department, recommending starting salaries for new employees, leading meetings to determine employees' eligibility for and amount of their annual bonus, and managing leaves of absence. *Id.* ¶¶ 113-115. While clearly in a managerial role, Fitzpatrick's position does not have the necessary involvement with and control of company policies that is necessary to extend MWA liability. Count II should be dismissed as to Fitzpatrick.

## 2. Timeliness of plaintiff's ADA claim – Count III.

Employment discrimination and retaliation claims brought under the ADA are subject to the requirements of Title VII. Title 42 U.S.C. §§ 2000e–5 to e–9; *id.* §§ 12117(a), 12203(c); *Rivera-Diaz v. Humana Ins. of Puerto Rico, Inc.*, 748 F.3d 387, 389 (1st Cir. 2014). Accordingly, before filing suit, a plaintiff must exhaust her administrative remedies which

requires the satisfaction of "'two key components: the timely filing of a charge with the EEOC and the receipt of a right-to-sue letter from the agency.'" *Rivera-Diaz*, 748 F.3d at 389 (quoting *Jorge v. Rumsfeld*, 404 F.3d 556, 564 (1st Cir. 2005)). In Massachusetts, the Equal Employment Opportunity Commission (EEOC) charge must be filed within 300 days of the alleged unlawful conduct. *See, e.g.*, *Williams v. City of Brockton*, 59 F. Supp. 3d 228, 244 (D. Mass. 2014). Failure to file timely such a charge leaves an ADA claim unsustainable without some form of waiver, estoppel, or equitable tolling. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Defendants assert that plaintiff failed to file timely her EEOC complaint, which was filed on June 8, 2016, because the date of filing occurred more than 300 days after she was terminated. (#22 at 5; #18-1 at 2-3.)[6] The amended complaint states that plaintiff's EEOC charge was filed timely because her formal request for severance benefits was denied on January 29, 2016.[7] (#20

---

[6] While the documents attached to plaintiff's complaint only evidence the EEOC's right to sue letter (#20-1 at 21), plaintiff sufficiently incorporates by reference the EEOC complaint itself. (*See* #20 ¶ 124.) Thus, the court may take notice of the EEOC complaint, which was submitted by defendants (#18-1). *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) ("A district court may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'") (quoting *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003)) (alterations in original).

[7] There is some confusion as to the exact benefit in issue with respect to Count III. The amended complaint sets out that BSC offers two types of severance plans, ERISA and unofficial. (*See* #20 ¶¶ 66-67.) The Factual Allegations section of the amended complaint states "Defendant BSC has refused to provide *any* severance benefits to Ms. Drachman." *Id.* ¶ 71 (emphasis added). The confusion arises in that the allegations set forth in Count III appear to focus on BSC's failure to provide severance benefits under its unofficial plan, *see id.* ¶¶ 120-122, yet the EEOC charge, also referenced in Count III, *id.* ¶ 124, and plaintiff's official request for severance benefits, *id.* ¶ 123, which affords plaintiff the right to bring her ADA claim, both address only the ERISA severance plans. Defendants do not address this inconsistency. (*See* #22.) Rather, defendants, in a footnote, in the section of their memorandum in support addressing the breach of the covenant of good faith and fair dealing, note that the EEOC charge concerns ERISA benefits and argue that ERISA preempts any such state law claim. *Id.* at 15 n. 8. However, defendants do not make such a preemption argument with respect to plaintiff's ADA claim, nor could they. *See Colonial Life & Acc. Ins. Co. v. Medley*, 572 F.3d 22, 27 (1st Cir. 2009) ("ERISA, however, does not preempt other federal laws, such as the ADA.") (internal citation omitted). In an effort to construe the amended complaint in a light most favorable to plaintiff, for the sake of this motion, the court will treat plaintiff's

¶¶ 123-124.) The viability of plaintiff's ADA claim turns on the point at which the "unlawful employment practice" occurred. Title 42 U.S.C. § 2000e–5(1); *Dulchinos v. Bay State Gas Co.*, 462 F. Supp. 2d 155, 161 (D. Mass. 2006). Thus, the question is: "When did defendant BSC unlawfully refuse to pay plaintiff severance benefits?"

The Supreme Court, in *Delaware State Coll. v. Ricks*, 449 U.S. 250 (1980), held that in cases where allegations of discrimination revolve around a single discrete act, the statute of limitations begins to run when the decision is made and communicated to plaintiff. *See Ricks*, 449 U.S. at 258. The *Ricks* case proves instructive in addressing defendants' argument. *Ricks* concerned a plaintiff who was allegedly denied tenure and terminated for discriminatory reasons. *Id.* at 257. The Court, rejecting the plaintiff's argument that the tenure decision was not final until after Ricks' grievance was denied, held that

> the only alleged discrimination occurred–and the filing limitations periods therefore commenced–at the time the tenure decision was made and communicated to Ricks. . . . [E]ntertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made.

*Id.* at 261 (emphasis in original). The nub of the matter, then, is when plaintiff was notified of defendant BSC's decision.

Applying *Ricks* to the instant case, it is apparent that defendants view plaintiff's filing of a formal request for severance benefits as merely an effort to remedy defendants' prior decision to withhold any such benefit, of which plaintiff was aware at the time of her departure. (#22 at 5-9.) Such an argument exceeds the scope of what can be inferred from the amended complaint. The amended complaint makes no mention of any official denial of severance benefits on the

---

allegations under Count III as though she asserts BSC's failure to provide ERISA or unofficial severance benefits constituted a violation of the ADA.

part of defendants, nor plaintiff's knowledge thereof, other than the January 29, 2016 denial of plaintiff's formal request for severance benefits under BSC's ERISA plan. *Id.* ¶ 123. Defendants state as much in their memorandum in support. (*See* #22 at 12 ("Drachman's Amended Complaint is completely devoid of any allegations that would support the conclusion that the parties agreed upon, or even discussed, terms of severance.").) Ergo, based on the facts alleged, the first time defendants communicated their decision to deny any form of severance benefit to plaintiff occurred on January 29, 2016, thereby making plaintiff's June 8, 2016 filing of her ADA claim timely. Defendants' motion with respect to Count III should be denied.

### 3. Breach of Contract – Count IV.

To make out a claim for breach of contract under Massachusetts law a plaintiff must demonstrate that: (1) the parties entered into a valid contract; (2) the plaintiff was ready, willing, and able to satisfy her obligations under the contract; (3) the defendant breached the contract; and (4) the plaintiff sustained damages as a result of that breach. *Hayes v. CRGE Foxborough, LLC*, 167 F. Supp. 3d 229, 245 (D. Mass. 2016). Defendants contend that neither the Bonus Plan nor the unofficial severance plan constitute a valid contract. (#22 at 9-12.)

### A. The Bonus Plan.

As an initial matter with respect to the Bonus Plan, defendants direct the court to the language of the Bonus Plan itself as evidence that no such contract existed between plaintiff and BSC. *Id.* at 9-10. The Bonus Plan explicitly states that it "is not intended to be a contract." (#20-1 at 11.) Moreover, the paragraph that follows the language to which the amended complaint cites is entitled "No Guarantee of a Bonus Award" and reads "[n]othing in this plan guarantees that any Bonus Award will be made to any individual. Receipt of a Bonus Award one year does not guarantee eligibility in any future year." *Id.* at 9 (emphasis in original). The Plan goes on to

state that "[t]he Committee reserves the exclusive right to determine eligibility to participate in this Plan and to interpret all applicable conditions[.]" *Id.* at 9-10. Plaintiff's sole argument in support of the Bonus Plan's enforceability as a contract is that her satisfaction of the Bonus Plan's criteria constituted consideration. (#20 ¶ 129.) Beyond her consideration argument, plaintiff merely states that the Bonus Plan constituted a contract. *Id.* ¶ 128. Such a conclusory assertion, in direct contradiction to the language of the Bonus Plan, fails to rise to the level of facial plausibility. *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) ("[I]t is essential to state with 'substantial certainty' the facts showing the existence of the contract and the legal effect thereof.") (internal citation omitted). Plaintiff's breach of contract claim as alleged under the terms of the Bonus Plan should be dismissed.

## B. The Unofficial Severance Plan.

Plaintiff alleges that BSC's regular payment of unofficial severance benefits to terminated employees who did not meet the ERISA plan requirements created an implied contract to provide similar benefits to plaintiff. (#20 ¶ 131.) In like manner to her Bonus Plan breach of contract claim, plaintiff puts forth a consideration argument for services rendered. *See id.* ¶¶ 131-134.

Under Massachusetts law, the pleading requirements for a breach of implied contract are identical to those of a breach of express contract; they differ only in the method of expressing mutual assent. *Katz v. Pershing, LLC*, 672 F.3d 64, 74 (1st Cir. 2012). Plaintiff's allegations as to the existence of an implied contract regarding the payment of unofficial severance benefits are facially deficient. The amended complaint fails to evidence a valid offer and acceptance to serve as the basis for the implied contract, because BSC never represented that it would provide plaintiff with any form of unofficial severance benefit. Rather, plaintiff makes the assumption

that because other individuals supposedly received such benefits, she was therefore entitled to the same. Plaintiff's implied breach of contract claim must fail and Count IV should be dismissed in its entirety.

4. <u>Breach of the Covenant of Good Faith and Fair Dealing – Count V</u>.

Massachusetts law implies a covenant of good faith and fair dealing into every contract. *S. Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc.*, No. CV 12-11663-GAO, 2016 WL 1732720, at *26 (D. Mass. Apr. 28, 2016). "The covenant of good faith and fair dealing requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 237–38 (1st Cir. 2013) (internal quotation marks omitted). "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (internal citation omitted).

Plaintiff contends that defendant BSC breached the covenant in three instances: (1) violating the terms of the Bonus Plan; (2) failing to provide unofficial severance benefits; and (3) failing to pay plaintiff the remainder of her accrued vacation pay. (#20 ¶¶ 135-144.) The first two allegations can be disposed of quickly. The analysis in the preceding section found that no contract existed with respect to either the Bonus Plan or the unofficial severance plan. *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005) ("In order to demonstrate a claim for the breach of the covenant of good faith and fair dealing, the plaintiff must show that there existed an enforceable contract between the two parties.") (internal quotation marks omitted).

With regard to plaintiff's remaining allegation – the failure to pay plaintiff accrued vacation pay – it appears that plaintiff proceeds on two factual bases. First, defendants Hendler and Fitzpatrick "orally promised Ms. Drachman that she would be paid for this earned vacation at the time of her involuntary termination[,]" (#20 ¶ 139); and second, that BSC's failure to do so was a violation of its vacation policy. (#20 ¶¶ 138-139.)

To the extent that plaintiff proceeds under the theory that the failure to pay plaintiff her vacation pay on her date of termination was a breach of the covenant, this claim is subsumed by her MWA claim.

With respect to the promises by defendants Hendler and Fitzpatrick, plaintiff cannot establish that there was an oral contract in the absence of consideration. "[I]n order for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 142 (1st Cir. 1998) (internal citation omitted). There are no allegations of any bargained-for exchange concerning the vacation days. (*See* #20 ¶¶ 45, 48-63, 139.) Indeed, the vacation days in issue were allegedly accrued in 2013 and the oral promises were made in 2014, after plaintiff had been informed of her termination. *Compare* (#20 ¶¶ 58, 61 (stating that plaintiff earned all of the improperly withheld vacation days prior to her FMLA leave))*, with id.* ¶ 45 (one week prior to her termination, plaintiff met with defendant Hendler for an exit interview in which the vacation pay was addressed)*, and id.* ¶¶ 48-49 (plaintiff contacted defendant Fitzpatrick on plaintiff's last day of work regarding, among other things, the whereabouts of her vacation pay). Thus, the alleged promises to provide the accrued vacation pay by defendants Hendler and Fitzpatrick occurred well after plaintiff performed services to

accumulate the days, thus leaving the promises without any contractual force for want of consideration.

Turning to the allegations regarding BSC, plaintiff fails to allege that the company's vacation policy was a valid contract between the parties. Notably, there are only two references to BSC's vacation policy in the amended complaint, both of which simply state that defendant BSC failed to comply with the terms of the policy. *See id.* ¶¶ 45, 138. Without more, the amended complaint fails to allege that the vacation policy is a contract to which the parties are bound. In the absence of an alleged contract, there can be no breach of the covenant. Therefore, all of plaintiff's claims for breach of the covenant of good faith and fair dealing must be dismissed for failure to allege any underlying contracts on which the claims are based. Count V should be dismissed in its entirety.

## V. <u>Conclusion</u>.

For all of the reasons stated, I RECOMMEND that Defendants' Motion to Dismiss (#21) be ALLOWED in part and DENIED in part.

## VI. <u>Review by District Court Judge</u>.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The objections must specifically identify the portion of the recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702

F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s / M. Page Kelley
M. Page Kelley
November 23, 2016                     United States Magistrate Judge